# EXHIBIT A

## AFFIDAVIT OF NICOLE SORRELL IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Nicole Sorrell, a Special Agent with Homeland Security Investigations, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I am a Special Agent with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and am assigned to the office of the Special Agent in Charge, Boston, MA.  I have been an agent of HSI since 2009.  As part of my duties, I am authorized to investigate violations of the laws of the United States, including criminal violations relating to child exploitation, child pornography, coercion and enticement, and transportation of minors, including but not limited to violations of 18 U.S.C. §§ 2422, 2423, 2251, and 2252A.  I have received training in the investigation of child exploitation offenses, including child pornography, and have had the opportunity to observe and review examples of child pornography (as defined in 18 U.S.C. § 2256).

2.      I am currently participating in an investigation relating to violations of federal law by an individual utilizing Kik[1] username **trainreq**,[2] for the possession and distribution of child pornography, in violation of 18 U.S.C. § 2252A.

3.      This affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure to search the residence located at ███████████, Randolph, Massachusetts (the "SUBJECT PREMISES"), and the person of Spencer HUGHES (YOB 1988), as more fully described in Attachment A, which is incorporated herein by reference.

---

[1]   Kik Messenger (hereinafter, "Kik") is a free instant messaging application for mobile devices used to transmit messages, images, videos, and other content.

[2]   For ease of reference, I will hereinafter refer to the individual simply by the username **trainreq**.

4.      As described herein, there is probable cause to believe that the SUBJECT PREMISES and

the person of HUGHES contain contraband and evidence, fruits, and instrumentalities of

violations of 18 U.S.C. § 2252A, which items are more specifically described in

Attachment B, also incorporated herein by reference.

5.      The statements in this affidavit are based in part on information provided by other law

enforcement officers and on my investigation of this matter.  Since this Affidavit is being

submitted for the limited purpose of securing a search warrant, I have not included each

and every fact known to me concerning this investigation.  I have set forth only the facts

that I believe are necessary to establish probable cause to believe that contraband and

evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A (possession,

receipt, and distribution of child pornography) are presently located at the SUBJECT

PREMISES and on the person of HUGHES.

## BACKGROUND ON KIK AND KIK REPORTS

6.      Kik Messenger (hereinafter "Kik") is a mobile application designed for chatting or

messaging.  It was previously owned and operated by Kik Interactive, Inc., a Canadian

company, but was acquired in October 2019 by a company based in the United States.[3]

According to the publicly available document "Kik's Guide for Law Enforcement,"[4] to use

this application, a user must download the application to a mobile phone, computer, or

other digital device via a service such as the iOS App Store, Google Play Store, Apple

---

[3]   The information outlined in this affidavit regarding the suspect user was obtained from Kik
before the company's American acquisition.   The application's functionality remains
substantially the same.  As such, this affidavit references certain processes, features, etc., in the
present tense, and specifically identifies reliance on documentation, guides, and policies that
were in effect prior to the acquisition.

[4]   Available at the writing of this affidavit at: https://lawenforcement.kik.com/hc/en-
us/articles/360039841472-Law-Enforcement-Guide.

iTunes, or another similar provider.  Once the application is downloaded and installed, the user is prompted to create an account and username.  The user also creates a display name, which is a name that other users see when transmitting messages back and forth.  Once the user creates an account, the user is able to locate other users via a search feature.  While messaging, users are able to send each other text messages, images, and videos.

7.     According to "Kik's Guide for Law Enforcement," Kik users are also able to create chat groups with a limited number of individuals to communicate in a group setting and exchange text messages, images and videos.  These groups are administered by the group creator, who has the authority to remove and ban other users from the created group.  Once the group is created, Kik users have the option of sharing a link to the group that includes all of their contacts or any other user.  These groups are frequently created with a group name containing a hashtag (#) that is easily identifiable or searchable by keyword.

8.     According to information provided to HSI by a Kik Law Enforcement Response Team Lead prior to the company's acquisition, Kik's Terms of Service prohibited Kik users from uploading, posting, sending, commenting on, or storing content that contains child pornography and/or child abuse images.  The Terms of Service also provided that Kik could review, screen, and delete user content at any time if Kik believed use of their services was in violation of the law.  According to Kik, Kik has a strong business interest in enforcing their Terms of Service and ensuring that their services are free of illegal content, and in particular, child sexual abuse material.  Accordingly, Kik reported that it independently and voluntarily took steps to monitor and safeguard their platform, and that ridding Kik products and services of child abuse images was critically important to protecting their users, product, brand, and business interests.

3

9.  Prior to October 2019, Kik was located in Ontario, Canada and was governed by Canadian law. According to information contained in the available "Kik Interactive, Inc. Child Sexual Abuse and Illegal Material Report and Glossary" (hereinafter Kik Glossary), which Kik provided when reporting information to law enforcement authorities, Kik was mandated to report to the Royal Canadian Mounted Police ("RCMP") any images and/or videos that would constitute suspected child pornography under Canadian law that were discovered on the Kik platform. According to the Kik Glossary, Kik was typically alerted to suspected child pornography on Kik based on digital hash value matches to previously identified child pornography, or through reports from other Kik users or third-party moderators. The RCMP has advised HSI agents that upon receiving a report from Kik related to suspected child pornography, the RCMP would review the reported IP addresse(s) of the Kik users contained in the Kik Reports to determine their location. The RCMP would then provide Kik Reports of Kik users in the United States to HSI in Ottawa, Canada, who in turn provided the Kik Reports to the HSI Cyber Crimes Center / Child Exploitation Investigations Unit located in Fairfax, Virginia for analysis and dissemination.

## STATEMENT OF PROBABLE CAUSE

### THE KIK REPORT

10. I have reviewed a Kik Report dated July 29, 2019. A review of the Kik Report shows that on July 27, 2019, at 10:41:37 UTC, an individual utilizing the Kik username **trainreq** (who provided the name "S H", email address authorthecamel@gmail.com, and device brand and model Android SM-T380), used Kik to send an image of child pornography, as described herein.

11.     I learned that Kik was alerted to the child pornography image on July 27, 2019, through the use of PhotoDNA[5] technology.  According to the Kik Glossary, Kik uses PhotoDNA to automatically scan user-uploaded files in order to flag images that may depict suspected child pornography and prevent such images from continuing to circulate through their application.  When PhotoDNA detects a suspected child pornography file, it creates a Report and sends it to the Kik Law Enforcement team.  According to information provided by a Kik Law Enforcement Response Team Lead, all suspected child pornography images and videos reported via a PhotoDNA Report, as well as any related user communications, are visually reviewed by a member of the Kik Law Enforcement Response team before a report is forwarded to law enforcement authorities.  Kik trains employees comprising its Law Enforcement Response Team on the legal obligation to report apparent child pornography.   The Team is trained on the Canadian statutory definition of child pornography and how to recognize it on Kik products and services.  Kik voluntarily makes reports to law enforcement in accordance with that training.  After Kik discovers suspected child pornography, Kik removes the content from its communications system and closes the user's account.

12.     Kik attached the suspected child pornography image to its July 29, 2019 Report.  On July 14, 2020, I reviewed the very same image that Kik provided with the Kik Report sent to the RCMP and forwarded to HSI. This image had previously been located, isolated,

---

[5]   PhotoDNA creates a unique digital signature (known as a "hash") of an image which is then compared against signatures (hashes) of other photos to find copies of the same image.  When matched with a database containing hashes of previously identified illegal images, PhotoDNA is used as a tool to detect, disrupt and report the distribution of child exploitation material. PhotoDNA is not facial recognition software and cannot be used to identify a person or object in an image.  A PhotoDNA hash is not reversible, and therefore cannot be used to recreate an image.

searched and viewed by Kik personnel before it was reported to the RCMP.  I reviewed only the image previously located, isolated, searched and viewed by Kik personnel and observed that the image is child pornography as defined by Federal Law.  Specifically, the image distributed by **trainreq** depicts a prepubescent girl who appears to be approximately 9 – 11 years old, posed lying on a floor completely nude with her feet up on a chair.  The child's genital area is the focus of the image, and the child appears to be spreading her buttocks to further expose her genital area to the camera, which are clearly visible.  There appears to be no hip or breast development or pubic hair on the child, and child's face is obscured by the positioning of her body.[6]

## IDENTIFICATION OF THE SUSPECT USER

13.    The information provided by Kik included IP addresses[7] associated with access to the pertinent Kik user account.  Specifically, IP address 73.143.144.156 was used by **trainreq**

---

[6]  To avoid unnecessary in-person interaction given the health concerns posed by the current pandemic, I am not providing a copy of this image to the Court.  I am aware that the "preferred practice" in the First Circuit is that a magistrate judge view images relied upon for the issuance of a search warrant in this context, to determine whether the images depict the lascivious exhibition of a child's genitals.  United States v. Brunette, 256 F.3d 14, 18-19 (1st Cir. 2001).  Here, however, the descriptions offered "convey to the magistrate more than [my] mere opinion that the image[s] constitute[s] child pornography."  United States v. Burdulis, 753 F. 3d 255, 261 (1st Cir. 2014) (distinguishing Brunette).  The child in this image appears to be no older than 11 – clearly younger than 18 – and the image depicts the child engaged in a sexual pose rather than "merely" the lascivious display of the child's genitals.  Furthermore, the description is specific as to the child's perceived age and physical characteristics.  See United States v. Syphers, 426 F.3d 461, 467 (1st Cir. 2005) ("The best practice is for an applicant seeking a warrant based on images of alleged child pornography is for an applicant to append the images *or provide a sufficiently specific description of the images* to enable the magistrate judge to determine independently whether they probably depict real children.") (emphasis added).  The description of the image here is sufficiently specific as to the age and appearance of the alleged child and the type of sexual conduct the child is engaged in that the Court need not view the file to find that it depicts child pornography.

[7]  An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric alphanumeric string used by a computer or other digital device to access the Internet.  Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic

on July 27, 2019 at 10:41:37 UTC to send a child pornography image.  In addition, according to the Kik report, IP address 73.143.144.156 was used to access the Kik user account multiple separate times on July 27, 2019.

14.     A query of the American Registry for Internet Numbers ("ARIN") online database revealed that IP address 73.143.144.156 was registered to Comcast Communications ("Comcast") during that time period.

15.     On December 20, 2019, an administrative summons was issued to Comcast in regard to the IP address described in Paragraphs 13 and 14.  A review of the results obtained on December 20, 2019 identified the following account holder and address during the specified date and time: Spencer HUGHES, ██████████, Randolph, Massachusetts 02368.  Comcast provided the following information associated with the account holder:

- Email: TheCamel@comcast.net
- Telephone: ████████-5562
- Type of Service: High Speed Internet

16.     A search of a public records database that provides names, dates of birth, addresses, associates, telephone numbers, email addresses, and other information was conducted for ██████████, Randolph, Massachusetts.  The public records located during the search indicate that HUGHES currently resides at that address, which is the address of the SUBJECT PREMISES.

---

sent from and directed to that computer or device may be directed properly from its source to its destination.  Most Internet Service Providers ("ISPs") control a range of IP addresses.  IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.  ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

17.    A search of Norfolk County, Massachusetts Registry of Deeds revealed that ███████

███, Randolph, Massachusetts, the address of the SUBJECT PREMISES, was

purchased by HUGHES on September 30, 2014.

18.    A review of an online listing of ████████, Randolph, Massachusetts, the address of

the SUBJECT PREMISES, revealed the SUBJECT PREMISES to be a condominium unit,

consisting of two bedrooms and two bathrooms, on the second floor of a two-story

condominium building.  Photographs included in the online listing depict the exterior of

the SUBJECT PREMISES, and the listing indicated that the condominium unit was last

sold on September 30, 2014.[8]

19.    Checks of the Massachusetts Registry of Motor Vehicles ("RMV"), revealed that

HUGHES holds a Massachusetts driver's license.  HUGHES reported the mailing and

residential address: ██████████, Randolph, Massachusetts, which is the address of

the SUBJECT PREMISES.  RMV records also revealed that HUGHES registered a motor

vehicle at the SUBJECT PREMISES, a black Ford Fusion sedan with Massachusetts

registration 6VE821.  The Massachusetts RMV was queried for additional drivers and

registered vehicles at the SUBJECT PREMISES, with negative results.

20.    Checks of the Massachusetts Criminal Justice Information System ("CJIS") revealed that

HUGHES holds an active Massachusetts License to Carry/ Firearms Identification Card

("LTC/FID"), with the SUBJECT PREMISES registered as his home address on file.

Further checks of Firearms Ownership ("FSI") revealed HUGHES to have purchased

multiple firearms registered to his LTC/FID.

---

[8] At the time of this affidavit, the link for the listing was: https://www.zillow.com/homedetails/███
████-Randolph-MA-02368/57500946_zpid/

21.     Checks of U.S. Department of State database revealed that HUGHES holds a valid United
        States Passport.   In HUGHES' passport renewal application, dated August 15, 2018,
        HUGHES reported his address to be ███████████, Randolph, Massachusetts, and his
        telephone number to be ████████5562.   HUGHES also reported his occupation to be a
        Police Officer with the Lincoln Police Department.

22.     On or about August 26, 2020, HSI Boston reviewed the Town of Lincoln's official Police
        Department website, which listed HUGHES as a Special Police Officer and a dispatcher.

23.     On May 4, 2020, HSI Boston agents conducted surveillance of the SUBJECT PREMISES.
        The agents noted that the location was a condominium complex consisting of townhouse-
        style units, each one with its own street number.   At approximately 1:30 p.m., the agents
        further observed a black Ford Fusion, bearing Massachusetts registration 6VE821, parked
        in a parking space adjacent to the SUBJECT PREMISES.   Further surveillance revealed
        that the parking space was marked "66".

24.     A check of open source information revealed a LinkedIn social media profile that appears
        to be associated with HUGHES.     The profile identifies the location Randolph,
        Massachusetts, and indicates the Town of Lincoln – Dispatcher / Special Police Officer as
        the employer and the position.

25.     On September 25, 2020, HSI Boston agents conducted surveillance of the SUBJECT
        PREMISES.   At approximately 11:00 a.m., the agents observed a black Ford Fusion,
        bearing Massachusetts registration █████, parked in the parking space marked "66".   An
        updated check of the Massachusetts RMV records confirmed that the black Ford Fusion,
        bearing Massachusetts registration █████, as described in Paragraph 18, continues to be
        actively registered to HUGHES.

**BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET**

9

26.    I have had both training and experience in the investigation of computer-related crimes, including those involving child pornography.  Based on my training and experience, I know the following:

   a.    Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other.  Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

   b.    Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable, or via wireless connections such as "WiFi" or "Bluetooth."  Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone.  These memory cards are often large enough to store thousands of high-resolution photographs or videos.

   c.    Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections.  Electronic contact can be made to literally millions of computers around the world.  Child pornography can therefore be easily, inexpensively, and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer, smartphone, or other internet-capable device.

   d.    The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  Electronic storage media of various types – including computer hard drives, external hard drives, CDs, DVDs, and "thumb,"

"jump," or "flash" drives, which are very small devices that are plugged into a port on the computer – can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones are also often carried on an individual's person.

e. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f. Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g. A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

11

h.  As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional (*i.e.*, by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional.  Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (*e.g*., temporary files or ISP client software, among others).   In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.   Such information is often maintained indefinitely until overwritten by other data.

**CHARACTERISTICS COMMON TO CONSUMERS OF CHILD PORNOGRAPHY**

26.  Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who produce, advertise, transport, distribute, receive, possess, and/or access with intent to view child pornography (i.e., "consumers" of child pornography):

a.  Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b.  Such individuals may collect sexually explicit or suggestive materials in a variety of media, including in "hard copy" and electronic format.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to

12

lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.    Such individuals almost always possess and maintain their hard copies of child pornographic material in the privacy and security of their home or some other secure location. Many individuals who have a sexual interest in children or images of children and who have hard copies of child pornographic material retain that material for many years.

d.    Likewise, such individuals often maintain their digital or electronic child pornography in a safe, secure, and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis, sometimes in an attempt to destroy evidence and evade law enforcement. I know through my training and experience that this type of behavior is often seen in individuals who have some level of technical expertise, are aware of law enforcement efforts to investigate child pornography offenses, gain access to child pornography on anonymized dark web networks like Tor or encrypted mobile applications (which are sometimes perceived by offenders as being "safe" from law enforcement detection), or struggle with their addiction or attraction to child pornography.

e.    Importantly, evidence of such activity, including deleted child pornography, often

can be located on these individuals' computers and other digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[9]

f.     Such individuals also may correspond with and/or meet others to share information and materials, often retain correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain contact information for individuals with whom they have been in contact and who share the same interests in child pornography.

g.     Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h.     I submit that even when individuals use a portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will be found in his home, including on digital devices other than the portable device (for reasons including the frequency of "backing up" or "synching" mobile phones to computers or other digital devices).

27.     Based on the foregoing and the following, I believe that the user of **trainreq** likely resides at the SUBJECT PREMISES and likely displays characteristics common to consumers of child pornography. As detailed herein, **trainreq** distributed child pornography via Kik. In

---

[9]     *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

order to distribute such material, he would necessarily have had to acquire and possess child pornography.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

28. As described above and in Attachment B, this application seeks permission to search for records that might be found at the SUBJECT PREMISES and on the person of HUGHES, in whatever form they are found.  One form in which the records are likely to be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

29. Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, accessing the internet, and storing a range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

30. I am aware of a report from the United States Census Bureau that shows that in 2016, among all households nationally, 89 percent had a computer, which includes smartphones, and 81 percent had a broadband Internet subscription.  Specifically, in 2016, when the use of smartphone ownership was measured separately for the first time, 76 percent of households had a smartphone and 58 percent of households had a tablet, and 77 percent of households had a desktop or laptop computer.  Further, according to the Pew Research

Center, as of 2019, 96 percent of adult Americans own a cellphone, and 81 percent own a cellphone with significant computing capability (a "smartphone"). The percentage of adults that own a smartphone is even higher among younger demographic groups: 96 percent of 18-29 year olds, 92 percent of 30-49 year olds, and 79 percent of 50-64 year olds owned smartphones in 2019.

31. I submit that if a computer or storage medium is found in the places to be searched, there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the reasons that follow.

32. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.

33. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

34. Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation,

16

file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

35.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  An internet browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

36.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES and on the person of HUGHES because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record

17

information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.   Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the

18

physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

37.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusion ns about how computers were used, the purpose of their use, who used them, and when.

38.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how

a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

39. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

40. I know that when an individual uses a computer or an internet-connected mobile device to obtain or access child pornography, the individual's computer or mobile device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer and mobile device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer and mobile device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer or mobile device used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

41. Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a

computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

a.   The volume of evidence – storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.   Technical requirements – analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.  Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.  Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at SUBJECT PREMISES or seize the computer equipment for subsequent processing elsewhere.

21

42.    The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene.   Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the SUBJECT PREMISES during the execution of this warrant.   If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

43.    The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B.   If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

44.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.   The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

45.    This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed

pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, HSI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CONCLUSION

46.   Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A.  I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

Nicole Sorrell
Special Agent
Homeland Security Investigations

Sworn and subscribed before me telephonically pursuant to Fed. R. Crim. P. 4.1 this _7_ th day of October, 2020.

HONORABLE JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE